## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLC HOLDING COMPANY, | ) | Case No. 13-24125 |
| F/K/A PNA HOLDING COMPANY, | ) | |
| an Illinois corporation, | ) | Hon. Janet S. Baer |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND AWARDING RELATED RELIEF

This matter having come before the Court on the motion of FLC Holding Company, f/k/a/ PNA Holding Company, debtor and debtor-in-possession herein (the "**Debtor**" or "**FLC**"), for entry of an order: (A) approving the asset purchase agreement, by and between the Debtor and Royal Financial, Inc., a Delaware corporation ("**RFI**" or "**Purchaser**") for the sale of substantially all of the assets of the estate; and (B) authorizing the sale of the assets of the Debtor pursuant thereto free and clear of liens, claims, encumbrances and interests, pursuant to Section 363 and 365 of the Bankruptcy Code (the "**Code**") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Sale Motion**")[1]; adequate and sufficient due written notice hereof having been given to all parties listed on the official service list herein, and all creditors and other interested parties in this case; no further notice being required under the circumstances; an offer to purchase the Bank Stock having been submitted by Purchaser pursuant to that certain Asset Purchase Agreement dated November 13, 2014 and all schedules and exhibits thereto (collectively, the "**APA**"), copies of which are attached as Group Exhibit A

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Sale Motion.

hereto and made a part hereof; the Court having reviewed and considered (i) the Sale Motion and

the APA (ii) the evidence proffered or adduced at the hearing held on December 23, 2014 before

this Court on the Sale Motion ("**Sale Hearing**"), including the offer of proof of Debtor's counsel

and supporting testimony of Lawrence Chlum, President of the Debtor and Leonard

Szwajkowski, President and CEO of Purchaser; and (iii) the statements of counsel and other

interested parties present at the Sale Hearing, and there being no objections filed or presented at

the Sale Hearing, and the Court being otherwise fully advised in the premises; and it appearing

that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and

creditors and other parties in interest; and after due deliberation thereon; and good cause

appearing therefore;

**IT IS HEREBY FOUND AND DETERMINED THAT BASED ON THE
REPRESENTATIONS OF DEBTOR'S COUNSEL**[2] *and the testimony proffered at the hearing* ✓ JSB

I.      On June 13, 2013, (the "**Petition Date**"), the Debtor filed a voluntary petition

under chapter 11 of the Code ("**Chapter 11 Case**"), and from and after said date has been

operating its business and managing its property under the jurisdiction of this Court as debtor in

possession pursuant to Sections 1107(a) and 1108 of the Code.

II.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.

III.      Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of facet where appropriate. Fed. R. Bankr. P. 7052

IV.    The statutory predicates for the relief requested herein are Sections 105, 363 and 365 of the Code and Rules 2002, 6004, 6006, 6007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**The Business of the Debtor**

V.    The Debtor is a savings and loan holding company ("**SLHC**") regulated by the Federal Reserve Board of Governors ("**FRB**"). The Debtor was formed in January 2000 for the purpose of owning the Bank Stock and to facilitate financing activities to support the Bank. The parent company of the Debtor, the Polish National Alliance of the United States of N.A., an Illinois domestic fraternal benefit society (the "**Alliance**") is also a SLHC regulated by the FRB. Upon the incorporation of the Debtor, the Alliance contributed all of the issued and outstanding Bank Stock to the Debtor.

VI.    The Debtor was initially named "**PNA Holding Company**".  In January 2013, the Debtor changed its name to "**FLC Holding Company**".

VII.    The Bank is a federally chartered savings bank.  The deposits of the Bank are insured by the FDIC.

VIII.    The Bank is, and has been since its inception in June 1999, a small community bank serving primarily Polish and Hispanic customers near its two branches, located at 4800 S. Pulaski Road in Chicago (the "**Pulaski Location**"), and the 7840 N. Milwaukee Avenue in Niles.

IX.    The Bank's loan portfolio primarily consists of small single family and multi-family residential mortgage loans to residents in its branch location areas.  Due to the collapse of the real estate market beginning in 2008, the Bank, which had always been profitable prior thereto, began experiencing serious increases in delinquencies, foreclosures and charge-offs

required by the federal regulators. As a result of these problems, the Bank began operating under

a Cease and Desist Order ("**C&D**") issued by the Federal Office of Thrift Supervision ("**OTS**"),

the Bank's primary regulator, in August 2010. Following the issuance of the C&D, the Office of

the Comptroller of the Currency, as successor to the OTS, directed the Bank to submit a

contingency plan and thereafter ordered the Bank to implement the contingency plan through the

merger of the Bank into another federally insured financial institution or to find another source

of capital.

### Secured Indebtedness and the TRUPs

X.     The Debtor has little or no operations and minimal cash. Accordingly, on or about

May 22, 2013, to facilitate the eventual filing of the Chapter 11 Case, the Debtor made, executed

and delivered to the Alliance the following: (a) Letter Agreement – Secured Non-Revolving Line

of Credit ("**Loan Agreement**") in the principal amount of $250,000 ("**Loan**" or "**Loan**

**Agreement**"); (b) Pledge and Security Agreement covering the Bank Stock ("**Security**

**Agreement**"); (c) Promissory Note in the principal amount of $250,000; and (d) two separate

Assignments Separate from Certificate for Certificate Nos. 1 and 2 which evidence all of the

Bank Stock (collectively, the "**Certificates**").[3] The Alliance perfected its liens and security

interests in and to the Bank Stock by taking physical possession of the Certificates concurrently

with the Debtor's execution and delivery of the above documents, and further by the filing of a

Uniform Commercial Code financing statement, Form UCC-1, with the Illinois Secretary of

State's Office on May 21, 2013 as Doc. No. 18270455.

---

[3] The Alliance executed the Loan Agreement and the Security Agreement on or about May 22, 2013. The Alliance's counterpart executed signature pages have inadvertently been misplaced. The Alliance thereafter re-executed, true and correct copies thereof.

339054v1

XI.    As of the Petition Date, the Debtor had drawn $150,000 from the Loan to pay a

necessary advance payment retainer to counsel for the Debtor.  There is a remaining line of

credit available to the Debtor under the Loan in the amount of $100,000 which has never been

drawn. The Debtor does not intend to seek further draws under the Loan.[4]

XII.    To refinance the Bank's operations, on November, 22, 2005, $7.5 million of trust

preferred securities (the "**TRUPs**" or the "**TRUPs Claims**") were issued to a third party investor

(the "**TRUPs Holder**"). The TRUPS Claims represent approximately 98% of the unsecured

claims in the Chapter 11 case.

### Prior Marketing Efforts and FABC Offer

XIII.    In response to the C&D and the ensuing directives, the Debtor retained the

investment banking firm of Raymond James & Associates ("**Raymond James**")[5] in late January

2012. From January 2012 – September 2013, a period of approximately 21 months, Raymond

James actively marketed the sale of all or a material portion of the assets or securities of the

Bank or the Debtor; the merger of the Bank or the Debtor with, various third parties; and the

potential private placement of securities of the Bank or the Debtor.

XIV.    By the end of 2012, Raymond James had continually encountered prospective

interested parties, none of which were interested in acquiring what was considered the Banks

underperforming loan portfolio ("**U/P Portfolio**"). Suggestions that the Alliance acquire the U/P

Portfolio instead were rejected by the Alliance. To try to overcome this obstacle, Raymond

---

[4] Prior to the filing of the Chapter 11 Case, the Alliance made an unsecured advance to the Debtor in the amount of $50,000.

[5] Raymond James is a nationally recognized investment banking firm, with among other things, had at the time of its retention, a dedicated Financial Services Investment Banking practice with over 40 individuals devoted to depository institutions, insurance companies, and specialty finance companies. It is the third most active investment banking firm as measured by the number of whole bank M&A and capital raising transactions for banks and thrifts over the last 10 years. At the time of the filing of the Prior Sale Motion, Raymond James had been a financial advisory on over 150 whole bank M&A transactions, 20 branch transactions, and 80 capital raising transactions.

James recommended that the Bank engage an outside expert to perform a detailed review of the Bank's entire mortgage loan portfolio, including the U/P Portfolio. To that end, the Bank retained, FTN Financial Capital Assets Corporation (**"FTN"**) to analyze the Bank's loan portfolio. FTN, an affiliate of a New York Stock Exchange traded company had a long history of evaluating the economic performance of a lender's loans, determine credit risks, and value an entire portfolio of multiple loan types in FDIC assisted acquisitions and other loan portfolio transactions. FTN's various detailed reports were issued as of September 30, 2012 (**"FTN Reports"**), and were used for Raymond James' renewed marketing efforts.

XV.    Following the completion of the FTN Reports, Raymond James contacted numerous parties over the following 8 months. Despite these efforts, only First American Bank Corporation (**"FABC"**) demonstrated serious interest. Here too, FABC required that the Alliance acquire the U/P Portfolio from the Bank before FABC would acquire the Bank Stock. Based on the strength of the FTN Reports, the Alliance, which previously had declined to purchase the U/P Portfolio, agreed that subject to the necessary federal and state regulatory approvals, it would purchase the U/P Portfolio.

XVI.    The many months of discussions and negotiations between the Debtor, the Alliance and FABC, and the events leading up to the execution of the Asset Purchase Agreement dated June 4, 2013 with FABC (**"FABC Offer"**), the stalking horse bid in the Prior Sale Motion. The FABC Offer required the significant participation of the Alliance in acquiring the U/P Portfolio, acquiring the Pulaski Location, and becoming the indemnitor of multiple and significant representations and warranties being made by the Debtor under the FABC Offer. Under the FABC Offer, the purchase price for the Bank Stock was $500,000, subject to multiple adjustments, which likely would have resulted in reductions to the purchase price.

339054v1

6

XVII.  On June 21, 2013, the Debtor filed the Prior Sale Motion [Docket No. 8] pursuant to which it sought to designate FABC as the stalking horse and to sell the Bank Stock to FABC pursuant to the FABC Offer.

XVIII.  On July 16, 2013, a sales and bidding procedures order was entered pursuant to the Prior Sale Motion [Docket No. 34]. A competing bid deadline of August 14, 2013, auction date of August 19, 2013 and sale hearing of August 20, 2013 were set (**"Prior Sale and Bidding Procedures Order"**).

XIX.   As the bid deadline under the Prior Sale Motion approached, no other competing bidders appeared, and it seemed certain the FABC Offer would be approved as the prevailing bid at the sale hearing.

XX.    On July 18, 2013, thirty six (36) days after the Prior Sale Motion was filed, and two (2) days after the entry of the Prior Sales and Bidding Procedures Order, counsel for the Alliance were informed that the IDOI would not support the Alliance's required participation under the FABC Offer. As a result, the Debtor could not satisfy the conditions to the FABC Offer.

XXI.   The Debtor and FABC resumed negotiations, but FABC declined to submit a modified offer which included the U/P Portfolio.

XXII.  With no pending offer, on August 20, 2013, the Debtor had no choice but to withdraw the Prior Sale Motion [Docket No. 46].

**Subsequent Marketing Efforts and RFI Offer**

XXIII. Following the withdrawal of the Prior Sale Motion, the Debtor's counsel engaged in negotiations with counsel for Grupa CRF, SP. Z.O.O ("**Grupa**") pursuant to which the Debtor, and Grupa would formulate and proceed under the FLC/Grupa Plan Option.  The

339054v1

FLC/Grupa Plan Option was predicated on the acquisition of the TRUPs by Grupa from the TRUPs Holder, which occurred in May 2014.

XXIV.   Counsel for Debtor was thereafter advised that Grupa was in negotiation with Alliance Bancshares Inc. ("**ABI**") for the sale of the TRUPs or to form some sort of partnership to acquire the Bank Stock.

XXV.   The Debtor entered into negotiations with ABI for the sale of the Bank Stock. These negotiations did not come to fruition.

XXVI.   Thereafter, the Debtor's representatives again turned their attention to the prospects of a 363 sale. Every bank which had shown interest during the Chapter 11 Case was contacted. Due diligence materials were made available.

XXVII.   On October 7, 2014, the Debtor's President was contacted by the President of RFI, parent corporation to Royal Savings Bank ("**RSB**"), a local financial institution. With public records showing RFI to be well over capitalized, and as an existing federally regulated financial institution, the Debtor believed RFI to be well suited to obtain federal regulatory approval to acquire the Bank Stock.  According to public records on file with the federal government, RSB has total assets of $136,300,000, deposits of $87.1 million, and Tier 1 Capital of $19.6 million. RSB has a Tier 1 Capital Ratio of 15.1%, and a total risk weighted capital ratio of 26.4%, both far above the federal thresholds to be considered "well capitalized".

XXVIII.      RFI began its due diligence efforts two days later and within three weeks had completed such efforts and submitted a term sheet to the Debtor for the acquisition of the Bank Stock through a 363 Sale. The term sheet proposed a purchase price for the Bank Stock of $1,200,000.00, with no adjustments (**"RFI Proposal"** or **"RFI Offer"**), well over two times what the FABC Offer had proposed one year before. The Debtor determined that a purchase

339054v1

price of $1.2 million would not only satisfy the secured and administrative claims in the Chapter 11 Case, but also provide a successful dividend to the unsecured creditors, including Grupa.

XXIX.        The FLC Board unanimously resolved to proceed with the RFI Proposal as a stalking horse bid and proceed with the Section 363 sale which would incorporate the competitive bidding process.

XXX.   On November 13, 2014, the Debtor and Purchaser entered into the APA and on that same day, the Debtor filed the Sale Motion.

XXXI. On November 26, 2014, the Court entered that certain Order: (a) Approving the Sale Process and Bidding Procedures with respect to the Sale of Substantially All of the Assets of the Estate, (b) Approving Form of and Authorizing Debtor to Enter into Stalking Horse Asset Purchase Agreement; (c) Approving a Break-Up Fee; (d) Scheduling a Public Auction and Subsequent Sale Hearing; (e) Authorizing the Sale of the Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Interests; and (f) Approving the Form and Manner of Notice of Sale Hearing (the "**Bid Procedures Order**").

XXXII.        The Bid Procedures Order, which incorporated the Bidding Procedures and the Sale Notice, approved the RFI Proposal as a Stalking Horse Bid and scheduled the Auction and the Sale Hearing.

XXXIII.        The Debtor thereafter served notice of the Auction and the Sale Hearing to the Notice Recipients and other interested parties, as evidenced by the Certificate of Service [Docket No. 97] and the Supplemental Certificate of Service [Docket No. 98] filed on December 4, 2014.

XXXIV.        The Debtor did not receive a Qualifying Bid prior to the Bid Deadline. Following the expiration of the Bid Deadline, counsel for the Debtor notified the office of the

United States Trustee, counsel for the TRUPs, counsel for ABI, counsel for RFI, the President of

the Debtor and counsel for the Alliance that pursuant to the Bidding Procedures, the Auction

would be cancelled, and that the Debtor would request that the RFI Offer be designated as the

Prevailing Bid at the Sale Hearing. Counsel for the Debtor further advised these parties that they

nonetheless intended to make a record of the proceedings and invited such parties to appear at

the offices of counsel for the Debtor at the time scheduled for the Auction. No parties appeared

and counsel for the Debtor announced on the record that pursuant to the Bidding Procedures, the

Auction would not proceed.

XXXV.       Accordingly, the Debtor requests that the RFI Offer be approved as the

Prevailing Bid and that the Debtor be further authorized to sell the Bank Stock to Purchaser

under the terms of the APA.

XXXVI.      At the Closing, the Debtor shall remit the net proceeds from the sale of the

Bank Stock into an escrow account, which proceeds will be disbursed only upon further order of

this Court.

**NOW, THEREFORE, THE COURT MAKES THE FOLLOWING
CONCLUSIONS OF LAW:**

A.       This Court has jurisdiction over the subject matter of this Sale Order pursuant to

28

U.S.C. §§ 157 and 1344(b) and (c), and applicable local rules regarding the referral to this Court

of cases under title 11 of the United States Code.  Venue of this Chapter 11 Case and the Sale

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.       The entry of this Sale Order and all proceedings relating thereto collectively

constitute a "core proceeding" pursuant to, without limitation, 28 U.S.C. §§ 157(b)(2)(A), (M),

339054v1

(N) and (O).  The statutory bases for relief sought in the Sale Motion are Sections 105, 363 and 365 of the Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

C.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

D.      The Debtor is the legal and equitable owner of the Bank Stock, which is property of the Debtor's estate.

E.      As evidenced by, among other things, the certificates and proofs of service on file with the Court, all interested parties (including, the Office of the United States Trustee, Purchaser, all secured creditors, all known creditors of the Debtor and all parties requesting notice in this Chapter 11 Case) had due, proper, timely, adequate and sufficient notice of the Sale Motion, the entry of the Bid Procedures Order and the Sale Hearing; were given an adequate and reasonable opportunity to present objections to the relief sought herein, or otherwise appear and be heard on the date hereof; and have submitted to the jurisdiction of this Court and are bound by this Sale Order. Accordingly, no other or further notice of the Sale Motion or the Sale Hearing is necessary under the circumstances and no other or further notice shall be required.

F.      The Debtor: (i) has full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the APA (the "**Transactions**"), and (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the Transactions contemplated thereby, and no consents or approvals other than those expressly provided for in the APA are required for the Debtor to

consummate the Transactions.  Upon entry of this Sale Order, the Debtor shall have full authority to consummate the Transactions.

G.  As demonstrated by (i) the evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor and its professionals diligently and in good faith have adequately marketed the Bank Stock and conducted the sale process in compliance with the Bid Procedures Order and the Auction was duly noticed to secure the highest and best offer therefor.  The Debtor and its professionals have actively marketed the Bank Stock and conducted the sale process in compliance with the Bid Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.

H  Purchaser's offer to purchase the Bank Stock pursuant to the APA constitutes the Prevailing Bid pursuant to the Bidding Procedures.

I.  Acceptance of the APA and consummation of the sale pursuant thereto is in the best interests of the Debtor, its estate, creditors and other parties in interest. The Debtor has demonstrated good, sufficient and sound business purpose and justifications for the entry hereof pursuant to 11 U.S.C. § 363(b) prior to, and outside the context of, a plan of reorganization in that, among other things, the Debtor is unable to fund a restructuring of its operations and there is an immediate need for the sale of the Bank Stock to avoid irreparable diminution of the assets in this estate.  Further, the only alternative to the Transactions is the orderly liquidation under Chapter 7 or Chapter 11 of the Code, which will result in little or no no distributions to general unsecured creditors of the estate.

J.  The consideration to be provided by Purchaser for the Bank Stock pursuant to APA (i) is fair and reasonable, (ii) is the highest and best offer for the Bank Stock, (iii) will

339054v1

maximize the existing value of the Bank Stock, (iv) will provide a greater recovery for the

Debtor's creditors and other interested parties than would be provided by any other practical

available alternative, and (iv) constitutes reasonably equivalent value and fair consideration

under the Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

K.     The APA was not entered into for the purpose of hindering, delaying or

defrauding creditors under the Code or under the law of the United State or the State of Illinois.

L.     The sale of the Bank Stock pursuant to the APA will be and shall constitute a

legal, valid, and effective transfer of the Bank Stock, and, except as provided in the APA, shall

be free and clear of any and all liens, claims, interests, liabilities and encumbrances whatsoever

to the fullest extent permitted by Section 363(f) of the Code with respect to the operation of or

arising under the business of the Debtor and/or the Bank Stock prior to the date of the Closing,

known or unknown, whether arising under any employment, pension, environmental,

advertising, products liability or other similar laws or successor liability claims or interests or

otherwise, including, without limitation: (i) all "liens" as defined in Section 101(37) of the Code,

and whether consensual, statutory, possessory, judicial or otherwise ("**Liens**"); (ii) all "claims"

as defined in Section 101(5) of the Code ("**Claims**"); (iii) all encumbrances of any kind in favor

of the Secured Creditors or any other known creditors of the Debtor; and (iv) those interests (1)

that purport to give to any party a right or option to effect any forfeiture, modification, right of

first refusal, or termination of the Debtor's interest in the Bank Stock, or any similar rights, and

(2) relating to taxes arising under or out of, in connection with, or in any way relating to or

arising under the operation of the Debtor's business or the Bank Stock prior to the consummation

of Closing (collectively, with Liens and Claims, the "**Interests**"). Any and all valid Interests

shall attach to the net proceeds of sale pursuant to Section 363(e), (f) of the Code, to the same extent and with the same validity and priority that existed immediately prior to the Closing.

M.      Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if the sale of the Bank Stock to Purchaser were not free and clear of all Interests of any kind or nature whatsoever (other than the Permitted Liens), or if Purchaser would, or in the future could, be liable for any of the Interests not expressly assumed by Purchaser pursuant to the terms of the APA.

N.      The Debtor may sell the Bank Stock free and clear of all Interests of any kind or nature whatsoever because, and as applicable, one or more of the standards set forth in 11 U.S.C. § 363(f) have been satisfied.  Those holders of Interests who did not object to the Sale Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2). Those holders of Interests who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their Interests, if any, attach to the net proceeds generated under the APA from the Bank Stock against or in which they claim or may claim an Interest, to the same extent and with the same validity and priority that existed immediately prior to the Closing; provided, however, that any liabilities assumed by Purchaser (the "**Assumed Liabilities**") are in fact assumed, as set forth in the APA, and certain proceeds of the sale shall be disbursed in accordance with the terms and conditions of the APA and this Sale Order.

O.      This Court shall retain jurisdiction to determine the validity, extent and priority of the Interests, as well as the extent to which such Interests may attach to the net sale proceeds. All net proceeds shall be held in escrow after the Closing and shall not be distributed without further Order of this Court.

P.     To the greatest extent provided under Section 363(f) of the Code, the (i) transfer of the Bank Stock to Purchaser will not cause Purchaser to be a "successor", or subject Purchaser to any liability whatsoever with respect to, arising under, or on account of, the operation of the business of the Debtor or the Bank Stock prior to the Closing or by reason of such transfer under any applicable laws, whether based, in whole or part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of implied assumption of liabilities other than the Assumed Liabilities, any theory of constructive consolidation or merger of Purchaser and the Debtor, any theory that Purchaser's acquisition is a mere continuation or reincarnation of the Debtor's business, any theory that the sale transaction is fraudulent or lacks good faith, or any other theory of antitrust, vicarious, successor or transferee liability.

Q.     Sound business reasons exist for the Transaction. The Debtor has demonstrated that it is an exercise of its sound business judgment and it is in the best interests of the Debtor, all of its creditors, the Debtor's estate, and other parties in interest to enter into this sale transaction and APA and consummate the sale. The Court finds that the Debtor has articulated good and sufficient business reasons justifying the sale. Such business reasons include, but are not limited to, the following: (i) the APA constitutes the highest and best offer for the Bank Stock; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Bank Stock and avoid decline and devaluation of the Bank Stock; and (iii) any plan would not have likely yielded as favorable an economic result.

R.     The APA was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and at arm's length bargaining positions with assistance of their respective advisors and choice of legal counsel. The Purchase Price for the Bank Stock set forth

339054v1

in the APA was not controlled by any agreement among any potential or actual bidders, and neither the Debtor nor Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided under 11 U.S.C. § 363(n). All relevant connections and relationships between the Debtor and Purchaser have been disclosed in the Sale Motion and throughout the pleadings filed in this case. Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in Section 101 of the Code, and no common identity of incorporators, directors or stockholders existed between Purchaser and the Debtor. Pursuant to the APA, Purchaser is not purchasing all of the Debtor's assets, and Purchaser is not holding itself out to the public as a continuation of the Debtor. The Sale does not amount to a consolidation, merger or de facto merger of Purchaser and the Debtor and/or the Debtor's estate, there is not substantial continuity between Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not a mere continuation of the Debtor or the Debtor's estate, and Purchaser does not constitute a successor to the Debtor or the Debtor's estate.

S.      Purchaser negotiated the APA in good faith and Purchaser is in all respects a good faith purchaser for value and, as such, is entitled to all of the protections afforded by Section 363(m) of the Code and any other applicable or similar bankruptcy or non-bankruptcy law. Purchaser has been and will be acting in good faith within the meaning of Section 363(m) of the Code in consummating the sale transaction.

T.      The consummation of the Transactions will be a legal, valid, and effective transfer of the Bank Stock to Purchaser, and will vest Purchaser with all right, title, and interest in and to the Bank Stock free and clear of all Interests, other than Assumed Liabilities in accordance with 363(f) of the Code.

339054v1

16

U.      The Debtor is not waiving or releasing any causes of action arising under Chapter V of the Code.

V.      The APA is a valid and binding contract between Debtor and Purchaser, which is and shall be enforceable according to its terms. All of the provisions of the APA are non-severable and mutually dependent.

## NOW, THEREFORE, IT IS HEREBY ORDERED EFFECTIVE IMMEDIATELY, as follows:

1.      The Sale Motion is granted and approved as outlined herein.

2.      All objections to the entry of this Sale Order and the relief granted herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied with prejudice and overruled on the merits.

3.      The APA and all terms and conditions thereof are hereby approved, and the Debtor be and is hereby ordered and directed forthwith to accept the APA for the purchase of the Bank Stock pursuant thereto.

4.      Pursuant to Section 363(b) of the Code, the sale of the Bank Stock free and clear of all Interests (except those specifically permitted by the APA, including Permitted Liens, if any), and the transactions contemplated thereby, are approved in all respects.

5.      Pursuant to Sections 363(b), 363(f) and 365(b) of the Code, Debtor is authorized, empowered, and, subject to the terms of the APA and this Sale Order, directed to execute, deliver and perform under, consummate, and implement the APA together with all additional instruments and documents that are required by Purchaser and may be reasonably necessary or desirable to implement the APA, and to take any and all action as it deemed necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and

339054v1

conferring to Purchaser or reducing to possession, the Bank Stock, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA, including, without limitation, any and all actions reasonably requested by Purchaser which are consistent with the APA.

6.     Pursuant to Sections 105(a), 363(f) and 365(b) of the Code, upon the Closing: (i) the transfer of the Bank Stock to Purchaser pursuant to the APA shall constitute a legal, valid and effective transfer of the Bank Stock and shall vest Purchaser with all right, title, and interest in and to the Bank Stock; and (ii) the Bank Stock shall be transferred to Purchaser free and clear of any and all Liens, Claims, encumbrances and Interests, other than the Assumed Liabilities, against such assets, in accordance with Section 363(f) of the Code, and with any and all such Liens, Claims, encumbrances and Interests to attach to the net proceeds of the Transactions with the same validity, force and effect held pre-petition and prior to this Sale Order, and pending further order of Court, subject to any rights, claims, and defense Debtor and all interested parties may have with respect thereto at the closing of the Transactions (the "**Closing**, or the "**Closing Date**"), as provided and contemplated, and required by, the APA.

7.     This Sale Order is and shall be effective as a determination that all Interests other than the Assumed Liabilities shall be and are, without further action by any person or entity, released with respect to the Bank Stock as of the Closing.

8.     The sale of the Bank Stock to Purchaser will constitute a transfer for reasonably equivalent value and fair consideration under the Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

9.     Except as expressly permitted or otherwise specifically provided by the APA or this Sale Order, to the greatest extent possible under Section 363(f) of the Code and within the

339054v1

requirements of due process, and provided further that the Closing shall have occurred, all

persons and entities, including, but not limited to, all governmental, tax and regulatory

authorities, administrative agencies, customers, trade and other creditors and parties in interest,

and their respective successors or assigns, including but not limited to, persons asserting any lien

or other encumbrance against the Bank Stock, holding Interests of any kind or nature whatsoever

in or against the Debtor or the Bank Stock (whether legal or equitable, secured or unsecured,

matured or unmatured, contingent or non-contingent, senior or subordinated, now existing or

hereinafter arising), arising under or out of, in connection with, or in any way relating to, the

Debtor, the Bank Stock, or the transfer of the Bank Stock to Purchaser, hereby are forever

barred, estopped, and permanently enjoined from asserting against Purchaser, its parents,

affiliates, subsidiaries, successors, assigns, representatives, agents and employees, the property

of Purchaser, or the Bank Stock, such persons' or entities' lien, claims or other Interests,

pursuant to any legal or equitable theory whatsoever, including, without limitation, (a) that

Purchaser is deemed to be a "successor" to the Debtor for any purpose, (b) that Purchaser is

deemed to have, *de facto* or otherwise, merged with or into the Debtor, or (c) that Purchaser is

deemed to be a continuation of the Debtor.

10.    Effective on the date of entry of this Sale Order, all entities, including but not

limited to the Debtor, creditors, employees, former employees and shareholders, administrative

agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal,

state and local officials, and their respective successors or assigns, including but not limited to,

persons asserting any lien or other encumbrance against the Bank Stock, shall be permanently

and forever barred, restrained and enjoined from commencing or continuing in any manner any

action or other proceeding of any kind against the Debtor or Purchaser as alleged successor or

otherwise with respect to any liens or other encumbrances on or in respect of the Bank Stock.

11.     Except for any Assumed Liabilities or as expressly provided in the APA,

Purchaser is not assuming, nor shall it, in any way whatsoever, be deemed to be liable or

responsible, as successor or otherwise, for any liabilities or Interests of the Debtor, or any

liabilities or Interests in any way whatsoever relating to or arising from the Debtor's assets, or by

virtue of the conveyance of the Bank Stock to Purchaser.

12.     This Sale Order (a) is and shall be effective as a determination that, upon Closing,

all interests, liens or other encumbrances of any name or nature existing as to the Bank Stock

have been and hereby are adjudged to be unconditionally released, discharged and terminated,

with all such liens or encumbrances attaching automatically to the proceeds in the same manner

and priority, and (b) shall be binding upon and govern the acts of all entities, including all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, administrative agencies or units, governmental departments or units,

secretaries of state, federal, state and local officials and all other persons and entities who may be

required by operation of law, the duties of their office, or contract, to accept, file, register or

otherwise record or release any documents or instruments, or who may be required to report or

insure any title or state of title in or to any of the Bank Stock conveyed to Purchaser. All

interests, liens, or other encumbrances of record as of the date of this Sale Order shall be

removed and stricken as against the Bank Stock in accordance with the foregoing other than the

Permitted Encumbrances.

13.     If any person or entity which has filed financing statements, mortgages, lis

pendens or other documents or agreements evidencing liens or other encumbrances on the Bank

Stock shall not have delivered to the Debtor prior to Closing, in proper form for filing and

executed by the appropriate parties, any termination statements, instruments of satisfaction,

releases of liens and easements and other documents necessary for the purpose of documenting

the release of all liens or other encumbrances which the person or entity has or may assert with

respect to the Bank Stock, the Debtor is hereby authorized upon Closing, and Purchaser is hereby

authorized upon Closing, to execute and file such statements, instruments, releases and other

documents on behalf of such person or entity with respect to the Bank Stock.  Upon Closing, and

upon the request of the Debtor or Purchaser, each of the Debtor's creditors is authorized and

directed to execute such documents and take all such actions as may be necessary to release their

respective Interests, if any, against the Bank Stock.

14.     The net sale proceeds, upon Closing as approved by this Court, shall remain

subject to the jurisdiction of this Court and shall be deposited in an escrow account to be

established prior to the Closing, and further shall not be disbursed to any Secured Creditor or any

other party pending further Order of this Court.

15.     The "Purchase Price" (as defined in the APA) and other consideration provided

by Purchaser for the Bank Stock constitutes reasonably equivalent value and fair consideration

under the Code, the Uniform Fraudulent Transfer Act, and all other applicable laws, and may not

be avoided under Section 363(n) of the Code.

16.     The Transactions have been, and is undertaken by the Debtor and Purchaser in

good faith, as that term is used in Section 363(m) of the Code and, accordingly, the reversal or

modification on appeal of the authorization provided herein to consummate the Transactions

shall not affect the validity of the sale of the Bank Stock to Purchaser, unless such authorization

is duly stayed by Court order pending such appeal. Purchaser is hereby granted and is entitled to

339054v1

all the protections provided to good faith purchasers under Section 363(m) of the Code, and is in all respects a good faith purchaser. In the event of any stay, modification, reversal or vacation of this Sale Order, then notwithstanding any such stay modification, reversal or vacation, all obligations incurred by the Debtor under this Sale Order and the APA prior to the effective date of such stay modification, reversal or vacation will be governed in all respects by the original provisions of this Sale Order, and Purchaser shall be entitled to the rights, privileges and benefits granted in this Sale Order with respect to all such obligations.

17.    As a good faith purchaser of the Bank Stock, Purchaser has not entered into an agreement with any other potential bidders at the sale, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Bank Stock, and therefore neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against Purchaser, and the sale may not be avoided pursuant to Section 363(n) of the Code.

18.    This Court shall retain exclusive jurisdiction to:

a.  Implement, interpret and enforce the terms and provisions of this Sale Order and the APA, all amendments and revisions thereto, and any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, (i) compelling delivery of the Bank Stock to Purchaser free and clear of all Interests (except as provided for in the APA), (ii) compelling the performance of other obligations owed by the Debtor and Purchaser, and (iii) compelling delivery of the Purchase Price or performance of other obligations owed to the Debtor;

339054v1

22

b. Protect Purchaser or the Bank Stock against, including, but not limited to (i) any Interest of any kind asserted against the Bank Stock, and (ii) any claims of successor liability related to the Bank Stock;

c. Enforce the injunctions provided herein with respect to the commencement or continuation of any action seeking to impose successor or other liability upon Purchaser;

d. Enter orders in aid or furtherance of the sale and the Transactions;

e. Adjudicate all issues concerning any actual or alleged Interests in and to the Bank Stock and the sale proceeds, including the extent, validity, enforceability, priority and nature of all such actual or alleged Interests; and

f. Except as expressly provided for herein, adjudicate any and all issues and/or disputes relating to the Debtor and title or interest in the Bank Stock and the proceeds of the sale, the value of the collateral asserted by the Alliance, the Sale Motion and/or the APA;

provided however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Transactions or this Sale Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

19. This Sale Order shall be effective as a determination that, on the date of the Closing, all Interests of any kind or nature whatsoever existing as to the Bank Stock prior to the Closing (other than the Permitted Liens) have been unconditionally released, discharged, and

terminated as to the Bank Stock, with such Interests to attach to the proceeds of the sale, and that the conveyances described herein have been effected.

20.     All persons or entities that are presently, or on the Closing Date may be, in possession of some or all of the Bank Stock, are hereby directed to surrender possession of the Bank Stock to Purchaser on the Closing Date.

21.     Each and every federal, state, or local governmental agency or department and any other persons or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

22.     From and after the date hereof, the Debtor is authorized to perform all acts and requirements consistent with the terms of the APA.

23.     This Sale Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of Purchaser, the Debtor, and their respective affiliates and subsidiaries, and the Bank Stock.

24.     The provisions of this Sale Order are non-severable and mutually dependent.

25.     Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor, or any claims against the Debtor, arising under or related to the Bank Stock other than the Assumed Liabilities.  Without limiting the generality of the foregoing, Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, except for the Assumed Liabilities set forth in the APA, and Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in

339054v1

24

connection with, or, in any way, relating to the operation or transfer of the Debtor's business or assets prior to the Closing Date, or any other obligations relating to current or former employees, or retirees of the Debtor and all parties are hereby forever barred, estopped and permanently enjoined from asserting any such claims against Purchaser, its successors and assigns or against the Bank Stock. The sale of the Bank Stock pursuant to the APA and this Sale Order shall not give rise to any claims for severance against the Debtor, or trigger any other employee benefit to any employee of the Debtor whose employment is continued by Purchaser after the Closing Date.

26.   The terms and provisions of the APA, the ancillary agreements entered in connection therewith and upon Closing, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of the Debtor and Purchaser and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Code or conversion of this case to a case under Chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding. The APA and the Transactions may be specifically enforced against, and shall not be subject to rejection or avoidance by, the Debtor or any Chapter 7 or Chapter 11 trustee of the Debtor.

27.   The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor or the Debtor's estate.

28.   The failure to specifically include any particular provisions of the APA, any ancillary documents executed in connection therewith, or this Sale Order shall not diminish or

impair the effectiveness of such provisions, it being the intent of the Court that the APA, such ancillary documents be authorized and approved in their entirety.

29.   To the extent of any inconsistency among the provisions of this Sale Order, the APA, and any document executed in connection therewith, the provisions contained in this Sale Order, the APA, and any documents executed or delivered in connection therewith shall govern, in that order.

30.   The Debtor will cooperate with Purchaser and Purchaser will cooperate with Debtor, in a commercially reasonable manner, in each case to ensure that the transaction contemplated in the APA is consummated, and the Debtor will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the APA.

31.   Purchaser shall have an ongoing obligation after Closing to cooperate with the Debtor in making the Debtor's records and other information available upon reasonable request to enable the orderly administration of the Debtor's estate.

32.   To the extent applicable, the automatic stay pursuant to Section 362 of the Code is hereby lifted with respect to Purchaser to the extent necessary, without further order of the Court (a) to allow Purchaser to give the Debtor any notice provided for in the APA and (b) to allow Purchaser to take any and all actions permitted by the APA.

33.   In the event that this Chapter 11 Case is dismissed or converted to a Chapter 7 case, or a trustee is appointed (whether under Chapter 11 or 7), neither the dismissal or conversion of this case, nor the appointment of such a trustee, shall affect, in any manner the rights of Purchaser under the APA, this Sale Order or any other agreement executed by the Debtor in conjunction with the sale or the Transactions, and all of the rights and remedies of

339054v1

Purchaser under this Sale Order, and such agreement shall remain in full force and effect as if the case had not been dismissed or converted or a trustee had not been appointed.

34.    This Sale Order shall be effective and enforceable immediately upon entry and the 14-day stay period provided by Bankruptcy Rule 6004(h) and 6006(d) shall not apply so that the sale may close immediately.

35.    A status hearing is set for this matter on *March, 24* _____, 2015 at *10:00 a.* m.


Dated: December 23, 2014



ENTER:

_____
UNITED STATES BANKRUPTCY JUDGE


*This order prepared by:*
Chad H. Gettleman (ARDC No. 944858)
Henry B. Merens, Esq. (ARDC No. 6181695)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
(312) 435-1050